The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you. Please be seated. Welcome everybody to the Fourth Circuit. We're happy to have you. We'll have arguments in 23-7-2-0-1, Mason versus Talley. Happy to hear from you to introduce our lawyers for the day. Yes. Good morning, Your Honor. And may it please the Court. My name is Daniel Scott Harawa and my job is easy today because I get to introduce recent NYU Law School graduates, J.D. Morales and Nick Field, who will be arguing under my supervision. Thank you very much. Counsel, we're happy to hear from you. Good morning, Your Honors. My name is J.D. Morales and I'm appearing for Appellant Omari Mason this morning. I'd like to reserve five minutes for rebuttal. May it please the Court. While Mr. Omari Mason was at Riverside Regional Jail facing federal criminal charges, defendants repeatedly violated his 14th Amendment rights against pretrial punishment. Twice, defendants shackled Mr. Mason to a teller. Can we just clear that up because that seems like a really critical question. Whether he was there pretrial or post-conviction on his state charges because that affects the standard we apply, right? Yes, Your Honor. I thought that your client had a, he had written a letter to the Court saying he was finishing up his time, his state time, which is up on December 27th, 2022. So why doesn't that resolve it, that he had been convicted and was doing his state time? Yes, Your Honor. So Mr. Mason did plead guilty to state charges. However, Mr. Mason repeatedly stated in his- And that's July of 2021. Yeah. And before that time, he was put into the state prison system when? On this particular instance. Obviously, he'd been there a lot, but when did he first go in on this stint? Yes. So in this particular instance, and we're not entirely clear on this record why specifically, but on August 19th, 2020 is when he began his time in RRJ for the time period at issue here. And at that point, he had not yet been indicted on federal charges. Correct, Your Honor. That would not be until May 19th, 2021 is when. And then in July, he pleads guilty and gets sentenced to effectively one year, you know, whatever it was, 20 with 19 suspended and five with four suspended. Yes. But the key thing here, Your Honor, is that we don't know exactly, Mr. Mason had been in RRJ for some time and we're not clear, and it's not clear on this record exactly how long, how much of his sentence he had actually served, how much of his time in RRJ. He was in RRJ prior to August 19th, but we understand based on the federal detainer that when his state sentence finished, he was then transferred to federal court. We actually do know that, right? That's what a federal detainer does. And so when was he transferred to federal custody? Made his initial appearance when? I believe he was transferred to... March of 2022. Yes. Okay. And so he's in state custody until March of 2022, he then makes his initial appearance on federal charges. So help me understand why you think he wasn't in state custody serving a state sentence in for example, December of 2021? What about that could possibly mean he's doing something other than serving a state court sentence that is the sentence of five years with four suspended and 20 with 19 suspended or whatever it was? Well, so your honor, it's not clear on the record in front of us exactly how much time was credited towards it. It's entirely possible that he had finished serving that time by the time that at least some of... But didn't he say he hadn't? I mean, there's this December 5th, 2022 letter where he says, I was in state custody. I went and spent some time with the US Marshals and now I'm back at RRJ finishing my state time, which is up on December 27th, 2022. I'm so sorry, which... That's JA-332. Okay. Well, so, um, so, so Mr. Mason in other writings to the court made it clear that he was, uh, he explicitly said that he was not even yet convicted. When did he make that statement? So that was, um, in response to... No, no. But what was the date? Um, the date, your honor, is, um, one second. Uh, apologies, your honor, one second. While you're looking, and can you also tell us whether, which conviction he's talking about there when he says he wasn't convicted? I mean, then one of the challenges with somebody who has so many different charges pending against him, he had like quite a few different charges for which he might not yet have been convicted, right? He had the state charges that he got basically a year sentence on. He was charged with the contraband offense, which he was not ultimately convicted on. And then he had the federal charges, which he, um, was not yet convicted on. So even if this statement that you have, um, was useful, how would we know what conviction he's referring to? I mean, that's, he's got a lot of convictions, right? And so to the extent there's any clarity from that, it seemed like to me Judge Rushing's answer provides like perfect clarity. Well, so, um, in that particular instance, he was referring to his, um, federal, uh, his pending federal criminal charges. Um, and the other parts of his complaint also support this when we look at the fact that he's talking about not having access to the law library, not being able to participate in his own defense. That doesn't apply. Why is, why is that relevant to the question Judge Rushing is asked? Because the question Judge Rushing is asked is about when his state conviction happened and when his state time began and when he was serving his state conviction. So the fact that he wasn't yet convicted on the federal offense just doesn't matter. Well, so your honor, we don't know exactly when he finished serving the state sentence, but we do know that he was in RRJ facing federal criminal charges and that he was, uh, there pursuant to a federal detainer. The record in front of us, it doesn't, we don't know, we can't say when that end date was, is based on the record in front of us. We have charging documents and we have a document that refers to some calculation of time applied, but there are times, uh, it doesn't say whether, uh, on the record in front of us, um, how the time is being calculated, uh, how much of the sentence he was serving, whether it was challenging how the sentence was calculated. No, uh, he's, uh, I mean that, that, I mean, you could say the state was wrong, but that would still place him in state custody. Even if the state was wrong, the state might've made a mistake. I don't know. Right? But, but he still was in state custody serving a sentence. Well, so the issue is we don't know when the state, when he was completed serving his state sentence. We're not, uh, disputing the actual, uh, sentence itself. Maybe when he said that he was finishing serving his state sentence, why wouldn't that be like a good place to start? Right? His, his statement that I finished serving in December of 2022, that seems like a person with knowledge who's stating when he's finishing his state time. Well, he's also, um, well, so we don't know exactly, um, when, Mr. Mason, uh, maintains throughout that he is there, um, that he is, um, done serving his state time. But, um, this only, um, goes to, um, resolving whether or not the eighth or the 14th amendment standard applies. And under either, uh, standard, Mr. Mason's claims should have survived summary judgment. Um, under the eighth or 14th amendment standard, the two incidents of shackling, um, Mr. Mason's claims were sufficient to have survived summary judgment. So twice, Mr. Mason was shackled for hours to a telephone. In the first instance, uh, he was shackled for more than six hours, um, and he was there for so long that he was forced to urinate on himself and soak in it for hours. In the second instance, less than a week later, despite telling, uh, RRJ officials and defendants, uh, please don't do that to me again, uh, he was there for more than four hours. Uh, he was there for so long that he passed out and struck his head and injured his wrist because he was still shackled to the phone. And we don't know quite exactly how long he was there in either instance because defendants, uh, have failed to turn over video evidence, uh, that demonstrates just when he was returned to his cell. Uh, this, uh, the Supreme Court made clear in hope that shackling a person for, uh, to a stationary object for an amount of time that, uh, exceeds that necessary to, uh, quell a threat or restore order violates the Constitution. That was a hitching post, right? Yes, Your Honor. Do you know what a hitching post is? Um, I... They described it in the opinion, right? The person's hands are shackled above their shoulders. It was intended to punish that man, right? He was out in the sun without a shirt. What was it, seven hours? Yes. On a hitching post while they mocked him and didn't give him anything to drink despite his thirst. And so you're comparing that to having one handcuff on a telephone because he wanted to use the telephone. And if he didn't want to use the telephone, the policy was to shackle him anytime he's outside the cell, right? So he would have been shackled to a table or something. Well, so the policy is that, uh, certain, uh, detainees or prisoners in RRJ are to be shackled for a recreation hour and defendants have never once at the court below or here explained why Mr. Mason was there for more than six hours, for more than four hours. In the second instance, the only- They have explained why he was shackled because, because we can read through your client's like record and come to the reasonable conclusion that the state had pretty good reason to think that shackling him was a good idea. Maybe not to the phone for the whole time, but having him shackled doesn't seem like a wild and crazy idea here given your client's actions, does it? Well, so- I mean, do you agree with that? Do you agree that, that the policy of having your client shackled is an eminently reasonable policy for the detention center to adopt given the conduct that he engaged in throughout this, this time? Well, the policy specifically mentioned- Start, start with the question and then you can explain something else if you'd like to, but do you agree that it was reasonable for the detention center to have a policy of shackling your client given his conduct in custody? Yes, your honor, to the extent that it's a one hour recreation shackling policy, which- And in Hope, there is some discussion about how he was shackled, but the discussion is about the six and a half, the amount of time that he was shackled and the amount of time that he wasn't given anything, anything to drink or allowed to use the restroom. Am I correct? Yes, your honor. In fact, the court in Hope specifically states that it is, that while things like being outside are potentially relevant, it is really at root being shackled to a stationary object for that period of time that surpasses that, that serves a legitimate penological purpose. And that much like in Hope, Mr. Mason was shackled to a telephone without any justification for why he needed to be there for more than six hours, and we don't know how long, without any, like Hope, water or bathroom access. Yes, sorry. What is the injury that you're claiming? Right, the objective prong requires an injury or a substantial risk of an injury. Yes, so Mr. Mason suffered several concrete injuries. He suffered permanent scarring and cuts to his wrists. He became so dehydrated that he passed out and struck his head, and he was forced to urinate on himself and soaked in it. Additionally, Hope specific... The requirement is a serious or significant physical or emotional injury. Yes. So what's the evidence of that in the record? Well, so defendants' own medical records provided showed that Mr. Mason was so dehydrated on the second instance that he was exhibiting clinical signs of dehydration, skin tenting, which occurs when someone is severely dehydrated. Four hours indoors in a climate-controlled area without water. Well, so again, Your Honor, we don't know exactly how long he was there, but for at least four hours, and it was enough that he passed out from dehydration such that he needed to be treated. He attests to the fact that he received injuries from the hours and hours of being shackled, of being restrained, cutting into his skin, and from passing out and striking his head, and Mr. Mason says he doesn't know how long he was unconscious on the floor. So Hope also specifically highlights that in this case, specifically that the plaintiff in that case suffered, that there was the high likelihood of risk of injury there, the exact kinds that Mr. Mason himself did, in fact, experience. And in Hope, there's no dehydration, there's no passing out. Exactly. And the court still said that there's a significant risk of injury. Yes, Your Honor. The risk alone was sufficient there. And here, Mr. Mason is actually saying that he suffered a head injury where he heard a sound in his head for months afterwards. Can I ask, your time's almost up, but it's just one more question. So assume for just a second, hypothetically, that Hope does not clearly establish the right that you are seeking to establish. Would you have us look anywhere else? I mean, are there other... I understand your argument on Hope, and we could play that out a little bit more, but just assume for a minute that it does not specifically establish the right that you're trying to assert here. Do you have anything else that you would have us to look at to clearly establish the right? Yes, Your Honor. Well, so under the 14th Amendment standard, we have... All right, maybe to make the hypothetical helpful, like let's stay in the Eighth Amendment context. Just because I'm trying to give you an opportunity to help me. So assume for a minute, hypothetically, that Hope doesn't get you there and that we're in the Eighth Amendment. What would you have me look at? Yes, Your Honor. So we have... Maybe your counsel can answer that on reply. Yes. Thank you, counsel, for your argument. Thank you, Your Honor. We're happy to hear from you, counsel.  Good morning, Your Honors. Brian Attara on behalf of the appellees. May it please the Court. I wanted to start out just on some of the questions about what standard actually applies here. I think Judge Rushing, your question hit the nail on the head of we have an admission by the plaintiff saying my state time ends in December of 2022, so almost more than a year after the events of this lawsuit. And I think below, it's important to note what his position actually was. It's this vague assertion that he hadn't been yet convicted of a crime and also that he wasn't confined in a quote-unquote prison. As we know, that's not the standard of whether you're in something titled a prison or in something titled a jail. It's your conviction status. At that time, he pleaded guilty to three criminal offenses on July 8th of 2021. He has a representation saying that he was still serving those sentences up until December of 2022. So I just, below the argument wasn't, well, okay, I actually had pleaded guilty to these offenses or I had been convicted of these offenses. It's just that those had been, I'd received time served or those were issued to serve concurrently. And so after a year, I was fine. That wasn't his position below. And that wasn't the position in the opening brief. It changed in the reply brief to say, okay, yes, those convictions did exist in state court, but we just don't know. And it's too obscure. I think his notice of change of address clarifies that point that the Eighth Amendment is the relevant standard here. Can you tell us anything based on the way he was treated in federal court about whether he was serving a state sentence or not? Obviously, we know in May of 2021, the detainer says that he is not currently serving a state sentence. And then he shows up in March of 22 is when he makes his initial appearance. Would you have us draw anything from that time sequence as to when he was serving a state sentence and when he was not? I think maybe whatever, what your Honor articulated earlier when speaking to the plaintiff, I think the more, I guess, cogent consideration is the fact that he is returning to state custody after entering the plea agreement in federal court. He's coming back to state custody to finish serving that. And then he returns to federal custody. Several of his filings in opposing the MSJs are from a federal penitentiary in South Carolina. Did he, when he was returned, I think this is March of 22, he goes, makes an initial appearance, comes back. When he's returned, did he have any pending charges in the state system separate from the convictions on the three charges that you described? Your Honor mentioned earlier the contraband charge. As far as that, that's all that I'm aware of. Do you know whether, this is not a memory test. I'm not trying to do that. I can look it up as easily as you can. But do we know whether that remained pending in March of 22? I do not know at this moment, Your Honor. I think though that just it's clear that the position below was not in a quote unquote prison, hadn't this vague assertion that he hadn't been convicted of his criminal offenses. And then what was in the record as far as the disposition notices go and the representation that he even understood himself to be serving state time when he was returning back to Riverside Regional from Pamunkey. So I, that doesn't resolve the procedural due process. That's going to be under the 14th Amendment regardless. But I think it does apply obviously to the conditions of confinement claim the plaintiff has asserted. Moving to the procedural due process claim, unless this court would like me to move somewhere else first, the kind of two-part. Your colleague focused on the shackling claims. That seems like a place to maybe start there rather than the other claim that your colleague chose not to address at all, probably for good reason. So maybe go to the shackling. Fair enough, Your Honor. So moving to the shackling claim, and I just, I would say that the condition, there's the, anyway, I'll move to the shackling claim, Your Honor. So as far as both the objective and subjective element go, there has to be the subjective or the significant physical or emotional injury or substantial risk thereof. I don't think, and I think the court was very clear in Hope v. Pelser, they repeatedly noted that it was relevant to the facts of that case as Plaintiff presented it, the specific risk presented by the factual situation there. And you have an individual in the summer without a shirt on who had been offered water maybe once or twice and is shackled in a way such that his arms are above his head so that if he lets his arms drop, the handcuffs are cutting into his wrist. And otherwise, he has to hold them up in a stress position to prevent that from happening. He's also getting mocked throughout that entire time. I just, I think from a physical injury standpoint, that is not comparable to the factual circumstance here. How is that? When here, this, Mr. Mason passed out from dehydration. You all aren't disputing that he was dehydrated, are you? I think based on the record, that's his representation. That's what the, I think the district court accepted the fact that he was dehydrated. Our position is that there was no evidence that he did not have access to water before he left his cell. He never stated that. And when he received medical treatment, the medical record, I believe the entry is at one o'clock in the afternoon. And so. But you don't dispute that he passed out? There's no dispute that he passed out? No, Your Honor. And I believe in the dehydration, he passed out. He had to be seen by medical staff at the detention center. Is that correct? Medical staff did come see him, Your Honor. Yes. All right. So how is that not significant risk of injury? Because I think, Your Honor, he's, again, in a climate controlled facility. People go without drinking water for four hours frequently. People do that when they are asleep. I don't know that there is a case or even just a situation that would put a correctional officer on notice that an individual not drinking water during a four-hour period might result in them passing out due to dehydration. But we don't know if he asked, if he didn't ask, because you all didn't turn over the second video in discovery as you were ordered to do. It's not that it wasn't turned over, Your Honor. There was representation that it didn't exist. And so it's not like there's a lot of discussion about. You're also not arguing here. In this posture, you might if it ended up going back to discovery, but you're not arguing in this posture that we should do anything other than accept his representations about that four-hour period. No, no, no. For our purposes, at this moment in time, we have to assume that he was not given water during those four-hour period. Yes, Your Honor. No, sorry. I apologize if any of that was unclear. No, Your Honor. My position was that I don't know that there is a situation or a case that I've seen where an individual, even if they requested water during a four-hour period, that there is a significant risk that they are going to pass out from dehydration when there is no understanding that they didn't have access to water before that time. I think the Jones versus Solomon case that we cite in our response brief, which dealt with an individual who was in a dry cell. He was provided water once in an 11-hour period, and this court didn't discuss the fact that that could have put him at risk for dehydration. I think that separates this from Hope versus Peltzer, where you have an individual in the sun in the middle of the summer in Alabama without a shirt on, coming from a work site after he'd been just subdued by four officers. Whereas here, plaintiff is in a climate-controlled environment. There's no allegation that he's not. There's no information or indication that he didn't have access to water. But isn't that what... But your argument is exactly what Hope rejects. The 11th Circuit, the materiality of it doesn't have to be, I guess, one-on-one. Here, you have someone who's dehydrated, six and a half hours, four to six and a half hours shackled. It seems to me in Hope that the main tenets of that case is the discussion of how long he was shackled. Not how he was shackled, where he was shackled. Six and a half hours for a recreational, one-hour recreational period. The Hope, if... Respectfully, Your Honor, I read it differently. I think it is very unique to the factual circumstance. I don't think it is just the duration of how he's restrained. If that is the bent that Your Honor is reading it with, I think it then is looking at the punitive aspect of it. Of these individuals are... There's obviously one person there watching him as he's... Can I ask this? If that's true, if Hope just says you can't be shackled for four hours, that would mean you can't be shackled for four hours. Whether they're giving you water, food, grass, bathroom, but they literally just can't keep you shackled for four hours? I mean, is that... Well, I think Hope is shackled without minimal life necessities. That's the part he's missing. Minimal life necessities. And I believe water is a minimal life necessity. I would agree, Your Honor, but I think going without it for four hours isn't putting an individual in a position of a significant physical or mental injury or substantial risk thereof. Again, people sleep. So, can I go back just to understand your position on that? Minimal life necessities. Do you agree that you have to have water within a four-hour period? No, Your Honor. You sort of answered that as like, that seems right. I'm just making sure. I thought you were saying earlier that having water every four hours is actually not a minimal life necessity. That lots of us, even though we probably should drink more water, don't drink water every four hours. No, that is my position, Your Honor. Water, generally speaking, is a life necessity. I don't think having to drink water every four hours is required. And under the Eighth Amendment standard, I'm not saying that it has to be appealable. I'm not saying that it has to be a desired condition. The Eighth Amendment prevents inhumane conditions. And I don't think that... And I think the case law supports this, that going without water for four hours constitutes an inhumane condition. I don't think, but it's the denial of a minimal life necessity. So, you're trying to get into, well, do we have to have water every eight hours? Do we have to have water? It's the denial of a minimal life necessity. A minimal life necessity is water, in which he was denied. And in Jones v. Solomon, Your Honor, the individual was in a dry cell for, I think, 17 hours, but there was only one cup of water provided in an 11-hour period. And the court found that the officer there was entitled to qualified immunity. We were not able to find a case saying that if you don't receive water within a four-hour window, that you are violating the Eighth Amendment. And the same for the shackling aspect of it, or the secured aspect of it, to a telephone pole. And Hope v. Pulsar, again, I just, I don't think it can be divorced from the context in which it arises, that, as Judge Richardson pointed out earlier, there were sufficient reasons to place plaintiff in restraints the way that he was. I mean, he had a significant discipline history. He had assaulted two inmates on two separate occasions at that point, and had also destroyed property. So, for him to say he didn't pose a threat to people, and one of those times he had also gotten into it with an officer while they were trying to break up the inmate fight, or address the inmate fight, that there is a reason why he is at least secured or shackled to a telephone pole, or to a telephone in a way that he was. But this was a one-hour recreational period. Why was he shackled for four and a half to six hours for a one-hour recreational period? We obviously have our position on why he was below the district court, because it was summary judgment accepting his position as it was, they just, they said that that justification obviously is a material, or not a material dispute, but a dispute on that issue. And so, they went with plaintiff's side of it, which I guess was because there wasn't a second officer around to let him off of the telephone at that time, because policy required that there be two officers in there when they're ever transporting someone from their cell to the telephone. That was the reason that the district court went with. And this happened two weeks in a row? Yes, Your Honor. And what was the government's proffered reason for why this, why he was left for four to six and a half hours? That he wanted to be on the telephone, Your Honor? I mean, throughout the video, he's actively making calls on the phone. I don't think that it is him just sitting there with the phone on the hook, making, you know, not doing anything. He's actively calling people, or at least has the, picking the phone up. But that's the dispute. I mean, that's the dispute that if it got past summary judgment, there would be a, you know, issue about whether he was there at his own request or whether he was there at the behest of the officers. Correct, Your Honor. And I think, but there wasn't the dispute is the fact that two officers needed to be there to transport him to and from his cell to the phone and back. And at that point, the accepted representation, I don't think it was disputed below, was that there was one officer available to do that at the time that he had asked to be taken off. I think also, just from the representation about plaintiff urinating on himself, that happened at 4 or 6 p.m. Going off the timeline that he created when looking at the video, up to that point, he had not represented to an officer that he needed to use the restroom. If you look, it's at J.A. 612. He notes time stamps of when certain things are happening, and he mentions asking for water at the 3.19 p.m. mark. But there's no reference of him needing to use the restroom before then. And so to say that they were, you know, somehow ignoring a fact of a request that he had made, I don't think that that's supported by the video or his affidavit when looking at it. Together, there's also a point that he represents that he had asked to be let off. It was around the 1.41 mark. I think it's the 2.55 mark on the bottom bar of the video. But there's no interaction shown in that video between him on the phone and the officer coming in and walking around. I think that is, I know that the standard is blatantly contradicted by the video. I think that is blatantly contradicted by the video. There's no interaction. He actually turns in, plaintiff turns in to face the phone booth when he's making the calls. That officer's in there walking around and then leaves. And he does, there's no interaction between them. As far as qualified immunity goes, we raised this in our brief. I just, there are very unique standards in the deliberate indifference frame. But we just think that the unique factual circumstances of this case did not make it established that either of those shackling incidences would have violated clearly established law. And King versus Riley, this court noted, you know, that despite the assertion of deliberate indifference, that the officer was still entitled to the two-prong approach for qualified immunity because it wasn't obvious that it violated the Constitution. Even if the officer knew of a actual risk of harm to individuals by not looking into windows when performing security checks, knew of that risk, and it was a risk. And even if policy required it, the court said that the officer was entitled to qualified immunity in that situation. And then I've already referenced it a few times, Your Honors, but Jones versus Solomon is another case in a similar situation where an inmate was forced to perform three bowel movements after purportedly ingesting some version of contraband. And in the third one, he was not provided with anything to clean his clothes after having to go through his feces. He was left in soiled clothing for 23 hours. He didn't have soap or water and ability to clean himself for 30 hours. And this court still said that the officers there were entitled to qualified immunity. And that's a 2024 case that would have postdated the events in this matter. And there's no hygiene concern in this case, right? This was, I mean, to distinguish it there. I haven't seen anything like that raised in the record. He was outside of his cell. He was retrieved two hours later. Is that correct? That's my understanding as well, Your Honor. And no representation that he wasn't able to clean himself or change clothing once he would return to his cell or that he told officers that and they denied him the ability to clean himself up. Let me ask you, I want to ask about the claim that the district court judge regarding the issue of summary judgment before discovery was complete. So it appears that the district court's decision is that the first video, it looks like she relied on the first video and the absence of the second video. And I believe the argument is that there should be a negative inference. I don't know where the second video is. There was an order by the district court, correct, for both videos. And then you all did not produce the second video. And I think you and I had some conversation about that a little bit earlier. Maybe it doesn't exist or, but should there be some negative inference drawn by the first video being cut off? There is no second video on this whole argument as to whether or not there's this issue of fact as to what happened. I don't think so, Your Honor. For the, I guess the primary reason the district court accepted his representation of what happened. I don't think the district court said, you know, just because there's a video, I'm not going to believe what you are purporting to say happened. Well, she did. She didn't accept everything she said. She didn't urinate on himself. She said, I don't see it on the video. And Your Honor, we're not defending that on appeal. I do think that that is inconsistent with the blatantly contradicted case law that this court has articulated with respect to videos. But I think even taking that aside and with regard to the second incident, I think she accepted everything that he said is true with respect to that and still said, you know, we're talking about a four-hour period here and it just, that's not the objective element of the Eighth Amendment claim. And so I don't think that that requires a negative inference, Your Honor. You're right, there was a court order. You know, I think that that's my answer, Your Honor. I don't think so. Just because she accepted that, I think she accepted what his representation of what the video would depict. And still found that it wasn't sufficient. And I still think on the clear, I think then coming back to, that's the just basis of the claim. And then coming back to the clearly established prong, Your Honor, accepting all of that is true. It wasn't clearly established that those events would violate the Eighth Amendment at that time. But I think his argument is that during this time, as to the second video, that he fainted. And because we don't have that video, that there's this issue, that this issue of fact is there because we don't know if he asked. You all are saying he didn't ask for water. He said he did ask for water. And so there's these disputed, how long was he there when he fainted? Did he hurt himself? Was his arms? So wouldn't all of that, was the district court premature in some judgment with all of those issues still out there in discovery? I don't think that those were issues, Your Honor. The court accepted that he had asked for a cup of water and was not provided with it. That was, that is in the district court's order. They accepted that as true. They didn't, or the district court didn't ignore that fact. I don't know that the video proves the injury. We do have the medical record showing when he was actually receiving medical care, what time on that date he was. So I think there's some backstop to that to provide evidence. And I'll... You can always answer her question. As long as she's asking questions, you keep answering. Yes, Your Honor. Thank you, Your Honor. That was my answer. Thank you, Counsel. Happy to hear from you, Counsel. Good morning, Your Honors. My name is Nick Field. I'm appearing on behalf of Omari Mason. May it please the court. So I'd like to start. Many pieces of this case have been, I'd say, disputed. And on that point, we think at the bare minimum, this case should be remanded for additional discovery. We think this is the bedrock rule from Shaw, where a summary judgment is disfavored prior to discovery. In fact, it's particularly disfavored when the defendants are in control of certain pieces of evidence. We think that applies here. The second video has not been turned over. There's this language that's been used that the district court essentially subpoenaed, but they didn't actually subpoena the video. Additionally, Mr. Mason requested affidavits, statements from the jail officials. There's an allegation that he should have pursued this through some other method. I'm not aware of any case law that supports that. Why does that matter in a context where the district court took the plaintiff's version of the facts as a given and says, I mean, at least in theory, maybe back away from this case, you might have specific arguments. But in theory, I understand the point of Shaw and the context of Shaw. But in a context where the court says, listen, even giving every benefit of the doubt to the plaintiff's version of the facts, it would not establish an Eighth Amendment violation. Why would they require discovery there? Because it seems like in that instance, they've accepted the facts as the plaintiff's alleged. Why would that require additional discovery? Or do you have to tell us why the discovery would do something more than the plaintiff's version of the facts? Right. So I'd start by saying I don't think that's the situation here. But to answer your question very directly. In that case, I still don't think there's a carve out in Shaw that says, if the district court accepts the factual allegations. Because I think part of the purpose of discovery is to determine information, is to find out what happened. Mr. Mason was passed out for part of the time during these incidents. He couldn't make statements about that. We don't know. There was no clock in the room that he was held. We don't know how long he was there for. What if it was nine hours instead? The evidence is not in the record. And therefore, discovery is appropriate in this case. And I think there are also, just to return to this case in particular, there are factual disputes beyond just that. Counsel on the other side said that he didn't ask to use the bathroom during the first incident. Mr. Mason swears that he did. This is a factual dispute that. But our review is de novo, right? That's correct. So we can grant you all of the facts in your favor when we do our review, right? Regardless of what the district court did. You can grant the facts. Again, I'd return to Judge Richardson's hypothetical and my response that discovery isn't certain here. We don't know exactly what would come from discovery. Mr. Mason has. We do require when plaintiffs claim that they, please don't decide this without discovery. They're supposed to identify what they need. He identified these two prison officials and said that they would be entirely consistent with what he has said in this video, which the court ordered the defendants to turn over and they said they didn't have. So we have a statement that he asked for consistent evidence and a video that we've been told doesn't exist. And that's it, right? Well, that is the evidence that Mr. Mason requested. The idea that this video doesn't exist is confusing. On the record, Mr. Mason has a sworn statement that defendant Bins told him he viewed the video to ensure that he wasn't faking passing out. That is, I believe, on JA 588. That's not inconsistent with it not existing now. Okay. We know there was a video in there because they got a video from one week and not from the next. The question is whether it was retained. Well, I think the discovery would then proceed to determine what happened to that video. Did the defendants purposely destroy that video? Where did it go? Who was in control of it? These are questions that should be answered on discovery. Can you answer the question that I asked your colleague that is accepting for a moment that this is an Eighth Amendment question and accepting for a moment that Hope does not establish the clearly or does not clearly establish the right that you're asserting here. What else would you have me look at? We would have you look at Robles. I realize that is a 14th Amendment case, but the... Okay, but how about go to... Are there any Eighth Amendment cases? Not that we know of. We don't believe that this is a common occurrence in jails or prisons. Thank you, counsel. We will come down and greet the lawyers and then proceed to our next case.
judges: Julius N. Richardson, Allison J. Rushing, DeAndrea Gist Benjamin